# United States District Court

FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
## CRIMINAL DIVISION

VENUE: SAN FRANCISCO



UNITED STATES OF AMERICA,

**V.**

ALBERT J. BERGONZI, CHARLES W.
McCALL, JAY LAPINE



DEFENDANT.

# INDICTMENT

18 U.S.C. § 371 – Conspiracy
18 U.S.C. §§ 1341 and 1343 – Mail and Wire Fraud
15 U.S.C. §§ 77q(a), 77x, 78j(b), 78m, 78ff and 17 C.F.R. 240.10b-5,
240.13b2-1 – Securities Fraud
18 U.S.C. § 2 – Aiding, Abetting and Willfully Causing

A true bill.

_Nelson S. Huaje_
Foreman

Filed in open court this _3rd_ day of
_June, 2003_.

Bergonzi - Summons

McCall - Warrant - $1 M secured bail

Lapine - Warrant -
$500 k PR Bnd          Bail, $_____

**BETTY FONG**
Clerk

**EDWARD M. CHEN**
**UNITED STATES MAGISTRATE JUDGE**



**1** KEVIN V. RYAN
United States Attorney
**2**



**3**

**4**

**5**

**6**

**7**

**8** UNITED STATES DISTRICT COURT

**9** NORTHERN DISTRICT OF CALIFORNIA

**10** SAN FRANCISCO DIVISION

**11**

| | |
|---|---|
| **12** UNITED STATES OF AMERICA, ) | No. CR 00-0505 MJJ |
| **13** Plaintiff, ) | VIOLATIONS: 18 U.S.C. § 371 – Conspiracy; 18 U.S.C. §§ 1341 and 1343 – |
| **14** v. ) | Mail and Wire Fraud; 15 U.S.C. §§ 77q(a), 77x, 78j(b), 78m, 78ff and 17 C.F.R. |
| **15** ALBERT J. BERGONZI, CHARLES W. ) | 240.10b-5, 240.13b2-1 – Securities Fraud; 18 U.S.C. § 2 – Aiding, Abetting and |
| **16** McCALL, and JAY LAPINE, ) | Willfully Causing |
| **17** Defendants. ) | SAN FRANCISCO VENUE |
| **18** ) | |

**19**

**20** <u>SECOND SUPERSEDING INDICTMENT</u>

**21** The Grand Jury charges:

**22** I. <u>BACKGROUND</u>

**23** A. <u>The Companies</u>

**24** 1. Prior to January 12, 1999, McKesson Corp. ("McKesson") was a corporation

**25** headquartered in San Francisco, California. McKesson was the largest healthcare supply

**26** management company in the United States.

**27** 2. Prior to January 12, 1999, HBO & Company ("HBOC") was a corporation

**28** headquartered in Alpharetta, Georgia, an Atlanta suburb. HBOC manufactured and sold

1 information technology products, primarily software, to customers in the health care industry.

2 HBOC was the largest health care information technology company in the United States.

3 3. On January 12, 1999, McKesson acquired HBOC, and the merged company became

4 known as McKessonHBOC. McKessonHBOC's headquarters were in San Francisco, California.

5 The portion of the company formerly known as HBOC became a wholly-owned subsidiary of

6 McKesson, continued to have its base in Alpharetta, Georgia, and operated as the Information

7 Technology Business of McKessonHBOC.

8 4. Following the acquisition, shareholders of McKesson and HBOC became shareholders

9 of McKessonHBOC.

10 5. HBOC, McKesson, and McKessonHBOC were publicly traded companies. HBOC's

11 stock was traded on the national market of the National Association of Securities Dealers'

12 Automated Quotation System ("NASDAQ"), an electronic trading system. The stock of

13 McKesson and McKessonHBOC was listed on the New York Stock Exchange ("NYSE"). The

14 companies had shareholders located throughout the United States, including in the Northern

15 District of California. Executives and employees from both companies, including McCALL,

16 regularly communicated with stock analysts throughout the United States, including in the

17 Northern District of California, regarding, among other things, their financial results and future

18 prospects.

19 6. As public companies, HBOC and McKessonHBOC were required to comply with the

20 regulations of the United States Securities and Exchange Commission (the "SEC"). Those

21 regulations are designed to protect members of the investing public by, among other things,

22 ensuring that a company's financial results are accurately recorded and disclosed to the public.

23 7. Under SEC regulations, HBOC and McKessonHBOC had a duty to: (a) make and

24 keep books, records and accounts that fairly and accurately reflected the company's business

25 transactions; (b) devise and maintain a system of internal accounting controls sufficient to

26 provide reasonable assurances that the company's transactions were recorded as necessary to

27 permit preparation of reliable financial statements; and (c) file with the SEC such reports as the

28 SEC may prescribe, including, but not limited to, quarterly reports on Form 10-Q.

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ                                    2

1          8. At all times relevant to this Second Superseding Indictment, HBOC's outside auditor

2 was Arthur Andersen LLP ("Arthur Andersen"). McKesson's and McKessonHBOC's outside

3 auditor was Deloitte & Touche LLP ("Deloitte").

4        B. The Defendants

5          9. The defendant CHARLES W. McCALL held several executive positions at HBOC

6 and McKessonHBOC. In January 1991, McCALL joined HBOC as chief executive officer

7 ("CEO"). In February 1998, he became chairman of HBOC's board of directors. On January 12,

8 1999, following the acquisition of HBOC by McKesson, McCALL became the chairman of the

9 board of directors of McKessonHBOC. A special committee of McKessonHBOC's board of

10 directors dismissed McCALL as an employee of the company on June 18, 1999.

11         10. The defendant ALBERT J. BERGONZI held several executive positions at HBOC

12 and McKessonHBOC. From January 1998 until November 1998, BERGONZI was HBOC's co-

13 president and co-chief operating officer ("COO"). He became HBOC's sole president and COO

14 in November 1998. From December 1997 through January 1999, BERGONZI reported directly

15 to McCALL. Following the acquisition, BERGONZI was named corporate executive vice

16 president of McKessonHBOC and president and chief executive officer ("CEO") of the former

17 HBOC operation. A special committee of McKessonHBOC's board of directors dismissed

18 BERGONZI as an employee of the company on June 18, 1999.

19         11. The defendant JAY LAPINE was an attorney for both HBOC and McKessonHBOC.

20 LAPINE joined HBOC in 1994 as an associate general counsel. In 1997, LAPINE became

21 general counsel of HBOC. Following the acquisition, LAPINE became general counsel for the

22 former HBOC operation. A special committee of McKessonHBOC's board of directors

23 dismissed LAPINE as an employee of the company on June 18, 1999.

24        C. Relevant Accounting Rules and Systems of Accounting Controls

25         12. During all times relevant to this Second Superseding Indictment, HBOC and

26 McKessonHBOC were required to and did have internal systems of accounting controls that were

27 designed to ensure that the companies' financial results were reported in conformance with

28 Generally Accepted Accounting Principles ("GAAP") and that revenue was properly recognized.

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ            3

1    13. In 1997, HBOC created the Contract Development and Administration (CD&A)
2    group within the finance department. It was the purpose of CD&A to collect all contract
3    documents, including any amendments or agreements modifying contracts. It was part of
4    HBOC's system of internal accounting controls that the sales force was required to send all
5    contract documents to CD&A. CD&A would send the collected contract documents to HBOC's
6    software revenue recognition department where it would be determined whether revenue could
7    be recognized. CD&A also would provide summaries, lists, and copies of contracts to HBOC's
8    outside auditors in connection with quarterly reviews and audits.

9    14. As public companies, HBOC and McKessonHBOC were required to adhere to
10   GAAP. GAAP included Software Revenue Recognition, Statement of Position 97-2 (Amer. Inst.
11   of Certified Public Accountants 1997) ("SOP 97-2"). SOP 97-2, which became effective for
12   HBOC on January 1, 1998, and for McKesson on April 1, 1998, prescribed requirements for
13   recognizing revenue from the sale of software licenses. Among other requirements, revenue
14   from a sale of software may not be recognized if the sale was subject to a right of return or other
15   contingency, if the sale price was not fixed and determinable, or if collection was not probable.
16   Defendants McCALL, BERGONZI, and LAPINE were familiar with and understood the
17   requirements of SOP 97-2.

18                              II. THE SCHEME TO DEFRAUD

19   15. Between approximately December 1997 and April 27, 1999, the defendants
20   CHARLES W. McCALL, ALBERT J. BERGONZI, JAY LAPINE, and others, devised and
21   intended to devise a scheme to defraud shareholders of HBOC, McKesson, and
22   McKessonHBOC, the investing public, and the SEC, and to deprive HBOC and
23   McKessonHBOC of their intangible right to the defendants' and other employees' honest
24   services.

25
26
27
28

1       16. Among the goals of the scheme were:

2               (a) to ensure that HBOC and McKessonHBOC reported that they had met or

3   exceeded projected quarterly results for, among other things, software sales revenue, net income,

4   and earnings;

5               (b) to artificially increase and maintain the share price of HBOC and

6   McKessonHBOC stock;

7               (c) to maintain and increase the defendants' positions in the companies, and to

8   enrich them and others through bonuses, salaries, and stock options; and

9               (d) to make HBOC attractive to other companies, including McKesson, for

10  potential mergers and acquisitions.

11      17. The means by which the defendants and others achieved and attempted to achieve the

12  goals of the scheme included:

13              (a) inflating quarterly software sales revenues by, among other things: (i)

14  recording revenue on contracts that were subject to "side letters" containing contingencies that

15  were concealed from outside auditors; (ii) backdating contracts to record revenue in prior

16  reporting periods; (iii) recording revenue on end-of-quarter "sales" that were actually mere

17  exchanges of cash and inventory; and (iv) recording revenue for sales on which HBOC had

18  secretly guaranteed repayment to a finance company in the event of customer default;

19              (b) making fraudulent entries to company books and records at quarter-end in

20  order to reduce operating expenses and thereby increase net income by whatever amount was

21  necessary to meet quarterly income and earnings-per-share forecasts;

22              (c) making false statements to outside auditors;

23              (d) filing materially false and misleading financial statements with the SEC;

24              (e) making materially false and misleading public statements about HBOC's and

25  McKessonHBOC's financial performance; and

26              (f) making materially false and misleading statements to the SEC in connection

27  with the merger.

28

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ                    5

1    18. It was part of the scheme to defraud that HBOC and McKessonHBOC improperly

2  recognized over \$62 million in earnings for the fiscal year ended March 31, 1998, and over \$266

3  million for the fiscal year ended March 31, 1999. The scheme involved the improper recognition

4  of revenue from over 200 separate contracts with HBOC and McKessonHBOC customers.

5    19. It was part of the scheme to defraud that the defendants McCALL, BERGONZI,

6  LAPINE, and others, regularly met and spoke in person, and corresponded by email and

7  voicemail during quarterly reporting periods to discuss, among other things, the status of

8  software sales for the quarter and to compare the companies' likely quarterly performance with

9  targeted goals. If it appeared that HBOC or McKessonHBOC might fall short of targeted goals,

10  as it did in each of the quarters ending in December 1997 through March 1999, McCALL,

11  BERGONZI, LAPINE, and others, agreed to and did engage in the fraudulent practices described

12  in this Second Superseding Indictment to ensure that those goals were met.

13  Fraud During Quarter Ended March 31, 1998

14    20. It was part of the scheme to defraud that the defendants McCALL, BERGONZI,

15  LAPINE, and others, agreed to engage and engaged in the following improper practices and

16  made the following misrepresentations, among others, during the quarter ended March 31, 1998.

17    21. In or about March 1998, McCALL, BERGONZI, LAPINE, and others met and

18  devised a scheme to inflate HBOC's quarterly revenue and earnings through devices that violated

19  GAAP. Among other things, the defendants agreed to attempt to increase quarterly revenue by

20  closing transactions with side letter contingencies that would not be reflected in the company's

21  books and records or provided to the company's outside auditors. The defendants also agreed

22  that the company would reduce its quarterly expenses by improperly using the company's

23  acquisition reserves and making fraudulent entries regarding the use of those reserves in the

24  company's books and records.

25    22. On or about April 1, 1998, HBOC entered into a \$1.106 million contract with

26  Covenant Health of Knoxville, Tennessee. BERGONZI approved a side letter to the contract,

27  which gave Covenant Health "the unequivocal right to cancel" prior to April 30, 1998. As the

28  defendants agreed, the side letter was separated from the sales contract, and only the contract was

1   forwarded to HBOC's internal accounting department, which was responsible for recording sales
2   revenue. HBOC improperly recorded $1.106 million in revenue from the sale in the period
3   ended March 31, 1998. Recording revenue on that transaction violated both GAAP and HBOC's
4   own revenue recognition policy.

5   23. During the first two weeks of April 1998, company employees shifted funds from
6   acquisition reserves to a general reserve and then used funds from the general reserve to reduce
7   current expenses. Those entries were in violation of GAAP and had the purpose and effect of
8   artificially reducing quarterly expenses, thereby improperly increasing quarterly net income and
9   earnings per share.

10   24. On April 14, 1998, HBOC issued a press release announcing preliminary results for
11   the period ended March 31, 1998. This press release was reviewed by McCALL, BERGONZI,
12   and LAPINE prior to being issued by the company. In the press release, McCALL falsely
13   represented that the company had a "strong software sales quarter." The defendants knew that
14   the press release was materially false in that, among other things, it included unaudited financial
15   statements that included revenue from transactions that were subject to side letters, reported
16   inflated net income, and represented that the company had "strong revenue and earnings growth"
17   in the quarter.

18   25. On or about May 6, 1998, McCALL and another member of HBOC management
19   signed a "management representation letter" addressed to Arthur Andersen in connection with its
20   quarterly review of HBOC financial statements. The letter included the following materially
21   false representations:

22       a.   "We have made available to you all financial records and related data."

23       b.   "There have been no [i]rregularities involving management or employees."

24       c.   "There are no violations or possible violations of laws or regulations whose
            effects should be considered for disclosure in the interim consolidated financial
25            statements . . . . In all cases, management's actions have complied with the
            Company's ethical code of standards."
26
        d.   "The accounting records underlying the interim consolidated financial statements
27            accurately and fairly reflect, in reasonable detail, the transactions of the Company
            and its subsidiaries."
28

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ                         7

1    e.    "All agreements with customers have been fully documented, communicated
           within the company following established procedures and made available to you."

2    f.    "The Company's revenue recognition related to its software sales comply with
3          AICPA Statement of Position 97-2 and the latest exposure draft update to SOP
           97-2."

4          26. In fact, as McCALL knew:

5    a.    HBOC had not made available to Arthur Andersen side letters and recourse
6          agreements, and had provided false explanations to Arthur Andersen for entries to
           HBOC books and records related to revenue, expenses and income;

7    b.    management was actively engaged in violating HBOC's accounting procedures,
8          circumventing its system of internal accounting controls, and was directing others
           to do so;

9    c.    management was violating applicable SEC rules and directing others to do so, and
10         was in violation of HBOC's ethical code of standards;

11   d.    accounting records failed to reflect side letters and recourse agreements, and the
           company was improperly using acquisition reserves to "smooth earnings" for the
12         purpose of meeting Wall Street financial expectations;

13   e.    side letters, contingencies, and recourse agreements were deliberately concealed
           from Arthur Andersen at the direction of management; and

14   f.    at the direction of management, HBOC was recording revenue in violation of
15         applicable accounting rules, specifically, Statement of Position 97-2.

16         27. On or about May 11, 1998, HBOC filed a report with the SEC on Form 10-Q,

17   reporting its financial results for the quarter ended March 31, 1998.  The reported results were

18   materially false in that they included improperly recorded sales revenue, failed to accurately

19   reflect quarterly expenses and net income, and failed to disclose that management had engaged in

20   and directed others to engage in fraudulent accounting practices.  Defendants McCALL,

21   BERGONZI, and LAPINE were aware that the company was required to and did file this Form

22   10-Q and each defendant reviewed it prior to the time it was filed.  Each defendant knew that the

23   Form 10-Q contained the material false statements set forth above.

24   Fraud During Quarter Ended June 30, 1998

25         28. It was part of the scheme to defraud that the defendants McCALL, BERGONZI,

26   LAPINE, and others, agreed to engage and engaged in the following improper practices and

27   made the following misrepresentations, among others, during the quarter ended June 30, 1998.

28

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ                          8

29. It was part of the scheme to defraud that HBOC improperly recognized revenue from approximately 59 contracts for the quarter ended June 30, 1998. McCALL, BERGONZI, LAPINE, and others met during the quarter and discussed the use of side letters and backdating to close contracts and recognize revenue.

30. On or about June 30, 1998, BERGONZI and LAPINE caused HBOC to enter into a $7 million transaction with the University of Pittsburgh Medical Center, of Pittsburgh, Pennsylvania ("UPMC"). The transaction was memorialized in a one-page "Contract Supplement" and was subject to a side letter, signed by BERGONZI, which gave the parties the right to cancel if they could not "flesh out the details of the contract" within 30 days. That period subsequently was extended by a series of additional side letters. The parties finally signed a contract on October 5, 1998. HBOC improperly recorded $6.99 million from the UPMC transaction as sales revenue for the quarter ended June 30, 1998.

31. On or about June 30, 1998, HBOC entered into a contract with Healthcare Imaging Services of Red Bank, New Jersey, which was subject to a side letter. The side letter, which BERGONZI approved, made the sale contingent on approval by the customer's board of directors. HBOC improperly recorded revenue from the sale in the amount of $1.9 million for the quarter ended June 30, 1998.

32. On or about June 30, 1998, BERGONZI approved a side letter to a contract with Holy Cross Hospital of Ft. Lauderdale, Florida, which made the sale contingent upon approval by the customer's board of directors and gave Holy Cross "the unequivocal right to cancel" prior to July 24, 1998. McCALL was involved in the negotiations of this contract and was advised that it was contingent on board of directors approval that would not be obtained until after the end of the quarter. HBOC improperly recorded revenue from the sale in the amount of $977,034 for the quarter ended June 30, 1998.

33. On or about June 30, 1998, BERGONZI approved a side letter to a contract with Wellpath Community Health Plans of Chapel Hill, North Carolina, which made the sale contingent on approval by the customer's board of directors. HBOC improperly recorded revenue from the sale in the amount of $870,000 for the quarter ended June 30, 1998. Wellpath

1 │ exercised its right to cancel the contract on July 31, 1998.

2 │ 34. On or about June 30, 1998, BERGONZI approved a side letter to a contract with
3 │ Intra-Coastal Health Systems, Inc. of West Palm Beach, Florida, which made the sale contingent
4 │ on review by the buyer's counsel and approval by its board of directors. HBOC improperly
5 │ recorded revenue from the sale in the amount of $602,000 for the quarter ended June 30, 1998.

6 │ 35. On or about June 30, 1998, BERGONZI approved a side letter to a contract with
7 │ West Georgia Health Systems of LaGrange, Georgia, which made the sale contingent on "final
8 │ review" approval by the customer's board of directors. HBOC improperly recorded revenue
9 │ from the sale in the amount of $446,350 for the quarter ended June 30, 1998.

10 │ 36. On or about June 30, 1998, BERGONZI approved a side letter to a contract with St.
11 │ Joseph Hospital of Augusta, Georgia, which made the sale contingent on "final negotiations of
12 │ the terms and conditions of the agreement." HBOC improperly recorded revenue from the sale in
13 │ the amount of $311,002 for the quarter ended June 30, 1998.

14 │ 37. On or about July 4, 1998, in furtherance of agreements between McCALL,
15 │ BERGONZI, LAPINE, and others, employees of HBOC made fraudulent entries to company
16 │ books and records by using acquisition reserves to reduce unrelated current expenses. Those
17 │ entries were in violation of GAAP and had the effect of artificially reducing reported operating
18 │ expenses and increasing quarterly net income and earnings per share.

19 │ 38. On or about July 13, 1998, HBOC issued a press release announcing preliminary
20 │ results for the period ended June 30, 1998. This press release was reviewed by McCALL,
21 │ BERGONZI, and LAPINE prior to being issued by the company. The defendants knew that the
22 │ announcement was materially false in that, among other things, it represented that the company
23 │ had "30% revenue growth" in the quarter, attached unaudited financial statements that included
24 │ revenue from transactions that were subject to side letters, and reported inflated net income.

25 │ 39. On or about June 30, 1998, an officer and general manager of HBOC advised
26 │ McCALL both orally and in writing that BERGONZI was engaged in overly aggressive revenue
27 │ recognition practices, including the use of contingent contracts.

28 │

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ                          10

1     40. On or about July 20, 1998, McCALL and other another member of HBOC

2  management signed a "management representation letter" addressed to Arthur Andersen in

3  connection with its quarterly review of HBOC financial statements. The letter included same the

4  materially false representations alleged in paragraph 24, above. McCALL knew that the

5  representations were false for the reasons alleged in paragraph 25, above.

6     41. On or about August 3, 1998, HBOC filed a report with the SEC on Form 10-Q. The

7  reported results were materially false in that they included improperly recorded sales revenue,

8  failed to accurately reflect quarterly expenses and net income, and failed to disclose that

9  management was engaged in and directing others to engage in fraudulent accounting practices.

10  Defendants McCALL, BERGONZI, and LAPINE were aware that the company was required to

11  and did file this Form 10-Q and each defendant reviewed it prior to the time it was filed. Each

12  defendant knew that the Form 10-Q contained the material false statements set forth above.

13  Fraud During Quarter Ended September 30, 1998

14     42. It was part of the scheme to defraud that the defendants McCALL, BERGONZI,

15  LAPINE, and others, agreed to engage and engaged in the following improper practices and

16  made the following misrepresentations, among others, during the quarter ended September 30,

17  1998.

18     43. It was part of the scheme to defraud that HBOC improperly recognized revenue from

19  approximately 64 contracts for the quarter ended September 30, 1998. McCALL, BERGONZI,

20  LAPINE, and others met during the quarter and discussed the use of side letters and backdating

21  to close contracts and recognize revenue.

22     44. On September 28, 1998, the defendant BERGONZI and others, caused HBOC to

23  enter into a reciprocal transaction with Computer Associates, an Islandia, New York, maker of

24  business software. Computer Associates agreed to buy $30 million in HBOC software products

25  for distribution, and, in exchange, HBOC agreed to buy $73.8 million in Computer Associates

26  software, also for resale. HBOC improperly recorded the $30 million as sales revenue for the

27  period ended September 30, 1998.

28

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ      11

1      45. McCALL, BERGONZI, and LAPINE knew that recognition of revenue on the

2   Computer Associates transaction was improper and took steps to conceal its terms. Among other

3   things, they split the transaction into separate contracts, neither of which made any reference to

4   the other, and BERGONZI signed a separate side letter altering the terms of HBOC's contract

5   with Computer Associates. Computer Associates has neither made use of nor distributed any of

6   the $30 million in HBOC software products, and HBOC has neither made use of nor distributed

7   any of the $73.8 million in Computer Associates software.

8      46. On or about September 30, 1998, BERGONZI caused HBOC to enter into a

9   $10,792,478 software transaction with Baptist Healthcare System, of Louisville, Kentucky

10  ("Baptist Louisville"). BERGONZI signed a one page side agreement that made Baptist

11  Louisville's obligations contingent on the execution of "mutually agreeable documents." HBOC

12  improperly recorded revenue for the sale in the amount of $10,792,478 for the quarter ended

13  September 30, 1998.

14     47. Between September 30 and October 5, 1998, BERGONZI caused HBOC to enter into

15  five licensing agreements with Baptist Health, of Montgomery, Alabama ("Baptist

16  Montgomery"). The transactions were finalized after the end of the quarter and they were subject

17  to a side letter that gave Baptist Montgomery the right to cancel prior to December 31, 1998.

18  HBOC improperly recorded $3.259 million in revenue for the quarter ended September 30, 1998.

19  Baptist Montgomery exercised its right to cancel the contracts in or about April 1999.

20     48. On October 1, 1998, BERGONZI and others caused HBOC to enter into a contract

21  with Staff Builders, Inc., a home health care agency based in Lake Success, New York, which

22  was backdated to September 30, 1998. Under the terms of the agreement, Staff Builders

23  promised to purchase $9 million in HBOC software, contingent on obtaining financing from

24  General Electric Capital Corporation ("GECC"). When GECC declined to provide financing

25  because of Staff Builders' poor credit rating, BERGONZI, LAPINE, and others allowed HBOC

26  to guarantee repayment to GECC through a "recourse agreement," which precluded revenue

27  recognition.

28

1      49. Because GECC had not yet finalized its financing contract with Staff Builders, it

2 advanced $6.9 million to HBOC (the "Bridge Loan"). HBOC had to pay interest to GECC on the

3 Bridge Loan, and was required to return the full loan amount to GECC if Staff Builders did not

4 complete financing arrangements within 60 days. Because GAAP did not permit immediate

5 revenue recognition given the recourse agreement and Bridge Loan, McCALL, BERGONZI,

6 LAPINE, and others concealed those agreements from company books and records, and from

7 Arthur Andersen. HBOC improperly recorded revenue from the Staff Builders contract in the

8 amount of $9 million for the period ended September 30, 1998.

9      50. On or about September 30, 1998, BERGONZI approved a side letter in connection

10 with a contract with Springhill Memorial Hospital of Mobile, Alabama, which made the sale

11 contingent on "administrative review" and approval by Springhill's board of directors. HBOC

12 improperly recorded revenue from the sale in the amount of $897,000 for the quarter ended

13 September 30, 1998. Springhill exercised its right to cancel the contract in October 1998, but

14 HBOC extended the cancellation right. On or about December 31, 1998, Springhill canceled the

15 contract.

16      51. In or about early October 1998, BERGONZI approved a side letter in connection

17 with a backdated contract with Sisters of Charity Health Care System of Houston, Texas, which

18 gave the buyer a right to cancel before December 14, 1998. HBOC improperly recorded revenue

19 from the sale in the amount of $1.746 million for the quarter ended September 30, 1998.

20      52. On or about October 5, 1998, in furtherance of an agreement between McCALL,

21 BERGONZI, LAPINE , and others, employees of HBOC made fraudulent entries to company

22 books and records by using acquisition reserves to reduce unrelated current expenses. Those

23 entries were in violation of GAAP and had the effect of improperly reducing quarterly operating

24 expenses and increasing quarterly net income and earnings per share.

25      53. On October 13, 1998, HBOC issued a press release announcing preliminary results

26 for the period ended September 30, 1998. This press release was reviewed by McCALL,

27 BERGONZI, and LAPINE prior to being issued by the company. The defendants knew that the

28 announcement was materially false in that, among other things, it included improperly recorded

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ
13

1   revenue and overstated quarterly net income and earnings per share.

2       54. On or about October 15, 1998, HBOC's senior vice president for sales resigned and
3   informed McCALL that he was doing so because BERGONZI was "out of control" and that the
4   sales force was suffering a "revenue hangover" as a result of the use side letters.

5       55. On October 23, 1998, McCALL and other members of HBOC management signed a
6   "management representation letter" addressed to Arthur Andersen in connection with its
7   quarterly review of HBOC financial statements. The letter included same the materially false
8   representations alleged in paragraph 24, above. McCALL knew that the representations were
9   false for the reasons alleged in paragraph 25, above.

10      56. On October 28, 1998, HBOC filed a report with the SEC on Form 10-Q. The
11  reported results were materially false in that they included improperly recorded sales revenue,
12  failed to accurately reflect quarterly expenses and net income, and failed to disclose that
13  management was engaged in and directing others to engage in fraudulent accounting practices.
14  Defendants McCALL, BERGONZI, and LAPINE were aware that the company was required to
15  and did file this Form 10-Q and each defendant reviewed it prior to the time it was filed. Each
16  defendant knew that the Form 10-Q contained the material false statements set forth above.
17  Fraud During Quarter Ended December 31, 1998

18      57. It was part of the scheme to defraud that the defendants McCALL, BERGONZI,
19  LAPINE, and others, agreed to engage and engaged in the following improper practices and
20  made the following misrepresentations, among others, during the quarter ended December 31,
21  1998.

22      58. It was part of the scheme to defraud that HBOC improperly recognized revenue from
23  approximately 161 contracts for the quarter ended December 31, 1998. McCALL, BERGONZI,
24  LAPINE, and others met during the quarter and discussed the use of side letters and backdating
25  to close contracts.

26      59. In October 1998, HBOC and McKesson conducted merger negotiations. On October
27  18, 1998, the companies announced in a press release that they had "signed a definitive
28  agreement for McKesson to acquire HBOC." According to the press release, the merger would

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ                                14

1 "create the world's first comprehensive healthcare supply management and information solutions

2 company, uniting the top-performing, rapidly growing leaders in their respective industries:

3 McKesson, the #1 healthcare supply management company, and HBOC, the #1 healthcare

4 information company." In the press release, McCALL falsely stated that HBOC was "currently

5 experiencing strong sales and earnings momentum." The press release also falsely reported

6 revenue and earnings from HBOC (as pooled with McKesson's revenue and earnings) for the

7 first three quarters of 1998.

8     60. On November 13, 1998, McKesson filed a Form S-4 with the SEC, which included

9 letters from McCALL discussing the information contained in the document and attachments to

10 the documents. The Form S-4 also included a joint proxy statement/prospectus discussing the

11 proposed merger and the merger agreement between HBOC and McKesson. The Form S-4 also

12 incorporated by reference HBOC's Forms 10-Q for the quarters ended March 31, 1998, June 30,

13 1998, and September 30, 1998.

14     61. The Form S-4 and the documents incorporated into the Form S-4 contained

15 materially false statements. For example, the merger agreement included a section titled

16 "Representations and Warranties of HBO." That section contained the materially false

17 representation that HBOC's financial statements filed with the SEC since 1996 "comply as to

18 form, as of their respective dates of filing with the SEC, in all material respects with applicable

19 accounting requirements and the published rules and regulations of the SEC with respect thereto,

20 [and] have been prepared in accordance with GAAP . . . ."

21     62. The Form S-4 also contained *pro forma* condensed consolidated statements of

22 income for McKesson and HBOC for six month periods ending September 30, 1998, and twelve

23 month periods ending March 31, 1998. The statements of income for HBOC included both

24 revenue and income recorded in violation of GAAP.

25     63. On or about November 5, 1998, McCALL signed a letter to Arthur Andersen in

26 which he falsely represented that "Since December 31, 1997, there have been no events or

27 transactions that have a material effect on the financial statements that should be disclosed in

28 order to make those statements not misleading."

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ      15

1    64. In January 1999, BERGONZI negotiated a backdated transaction with WebMD that

2    enabled HBOC to record additional revenue for the December 31, 1998 quarter. WebMD agreed

3    to buy $5 million in HBOC products, and HBOC assumed an obligation to purchase and resell at

4    least $3.59 million in WebMD products. The contract, which was split into two documents, was

5    signed by BERGONZI on or about January 7, 1999. HBOC improperly recorded $5 million from

6    the WebMD transaction as revenue for the quarter ended December 31, 1998.

7    65. On or about January 5, 1999, BERGONZI and LAPINE caused HBOC to enter into

8    another transaction with UPMC. Under the terms of the deal, which was memorialized in a

9    "Contract Supplement" backdated to December 31, 1998, UPMC had the option to purchase $2.4

10   million in HBOC software products. BERGONZI signed a side letter permitting UPMC to

11   cancel the deal if it decided not to make a purchase by February 3, 1999. The right to cancel was

12   extended by a series of additional side letters. HBOC improperly recorded $2.323 million from

13   the UPMC deal as revenue for the period ended December 31, 1999. On April 28, 1999, UPMC

14   exercised its right to cancel.

15   66. On or about December 31, 1998, BERGONZI caused HBOC to enter into a $1.59

16   million transaction with St. Barnabas Hospital of Bronx, New York. The transaction was subject

17   to a side letter, which made it contingent on "finishing legal review and implementation plan of

18   the definitive agreement" within 90 days. HBOC improperly included the $1.59 million in

19   revenue from the St. Barnabus (Bronx) contract in the period ended December 31, 1998.

20   67. On or about November 10, 1998, BERGONZI cause HBOC to enter into a $1.994

21   million contract with St. Barnabus Healthcare System of Livingston, New Jersey. The contract

22   was subject to a side letter making agreement contingent on the customer's "final review and

23   approval" before February 28, 1999. On or about March 31, 1999, BERGONZI approved an

24   extension of the contingency to September 30, 1999.

25   68. On January 25, 1999, McKessonHBOC management held a conference call with

26   securities analysts and issued a press release announcing HBOC and McKesson's combined

27   results for the period ended December 31, 1998. McCALL and BERGONZI made false

28   statements during the conference call. McCALL stated that HBOC "had very, very strong

1 revenue growth for the year. We exceeded our target at 25% revenue growth last year and during
2 the quarter, I think we had a great deal of success and continue to build our strong base of
3 recurring revenue and outsourcing revenue, as well as Al [BERGONZI] mentioned, significantly
4 increasing our software backlog." BERGONZI said "operating profit... of McKessonHBOC's
5 information technology business, formerly HBOC, increased 36% for the three months ended
6 December 31, 1998...." In fact, both McCALL and BERGONZI knew that HBOC's revenue
7 growth for 1998 was not strong, that its publicly-reported revenue included sales that were not
8 booked according to the requirements of GAAP, and that the company's software backlog had
9 been decreased by the prevalent use of side letters and contingencies to close transactions
10 prematurely.

11 Fraud During Quarter Ended March 31, 1999

12 69. It was part of the scheme to defraud that the defendants McCALL, BERGONZI,
13 LAPINE, and others agreed to engage and engaged in the following improper practices and made
14 the following misrepresentations, among others, during the quarter ended March 31, 1999, which
15 was the first following the acquisition.

16 70. It was part of the scheme to defraud that McKessonHBOC improperly included
17 revenue from approximately 37 contracts for the quarter ended March 31, 1999, when the
18 company released its financial results on April 22, 1999.

19 71. On or about March 31, 1998, BERGONZI caused McKessonHBOC to enter into a $1
20 million transaction with St. Barnabas Hospital of the Bronx, New York. The contract was
21 backdated and subject to a side letter, which made it contingent on "finishing legal review and
22 implementation plan of the definitive agreement" within 90 days. McKessonHBOC improperly
23 included the $1 million in revenue for the period ended March 31, 1999. On or about June 18,
24 1999, St. Barnabus exercised its right to cancel the contract.

25 72. On or about March 23, 1999, BERGONZI approved a side letter in connection with a
26 contract with CHRISTUS Health of Houston, Texas, which gave CHRISTUS the right to cancel
27 the contract. McKessonHBOC improperly recognized $5.644 million in revenue from this
28 contract for the quarter ending March 31, 1999.

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ
17

**1**  73. On or about March 28, 1999, BERGONZI and others proposed a reciprocal

**2**  transaction to Oracle Corporation, a Redwood Shores, California manufacturer of database

**3**  products. Under the proposed deal, Oracle would purchase and pay for $20 million in

**4**  McKessonHBOC software by March 31, 1999, and McKessonHBOC would agree to buy $25

**5**  million in Oracle products in the future, and encourage customers to convert to Oracle's product

**6**  lines.

**7**  74. To conceal the true nature of the transaction, BERGONZI and others proposed that

**8**  the transaction be reflected in two separate contracts. They further proposed that only the

**9**  contract obligating Oracle to buy $20 million in software be executed by March 31, 1998, and

**10**  that Oracle "trust" McKessonHBOC to execute the second contract in the next quarter. Deloitte

**11**  learned of the proposed transaction and advised BERGONZI and others that revenue from this

**12**  transaction could not be recognized under GAAP because of its reciprocal nature.

**13**  75. On March 31, 1999, Oracle declined to enter into the proposed transaction, in part

**14**  because it had no reason to purchase McKessonHBOC software. As a result, McKessonHBOC

**15**  failed to meet its software sales revenue goals for the quarter ended March 31, 1999.

**16**  76. On April 1, 1999, after the end of the March 31 quarter, BERGONZI directed a

**17**  McKessonHBOC employee to contact Data General Corporation, a Westborough,

**18**  Massachusetts-based manufacturer of computer hardware, and determine whether it would be

**19**  willing to enter into a reseller transaction involving approximately $20 million of

**20**  McKessonHBOC software that would be backdated to March 31.

**21**  77. On or about April 2, 1999, at BERGONZI's request, McCALL contacted Data

**22**  General's chief executive officer who told McCall that any transaction would have to include an

**23**  agreement in which McKessonHBOC promised to buy back any software that Data General

**24**  could not resell.

**25**  78. BERGONZI, LAPINE, and others then negotiated the transaction with Data General

**26**  throughout the weekend of Friday, April 2, 1999, finalizing the deal on Monday, April 5, 1999.

**27**  The negotiations resulted in the following agreement: Data General would immediately purchase

**28**  $20 million in McKessonHBOC software products, for resale to third parties, and

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ                    18

1 McKessonHBOC would make $25 million in future purchases of Data General hardware, also
2 for resale. Because Data General had no ability to resell McKessonHBOC products,
3 McKessonHBOC assumed that obligation. If McKessonHBOC failed to resell half the software
4 by July 22, 1999, it would pay Data General $10 million, less the value of any resales. If it failed
5 to resell the remaining half by September 24, 1999, it would pay Data General another $10
6 million, again less the value of any resales, and Data General could return all unsold software.

7 79. The documents memorializing the Data General transaction were designed by
8 BERGONZI, LAPINE, and others to conceal various aspects of the deal. Although executed in
9 its entirety on April 5, 1999, the Data General contract was reflected in two separate documents
10 with different dates. The first document, which was backdated to March 31, 1999, purported to
11 be a reseller agreement under which Data General bought $20 million of McKessonHBOC
12 software for resale. The second document, called an "Amendment," was dated April 5, 1999 (the
13 "Amendment"). The Amendment contained McKessonHBOC's obligation to buy $25 million in
14 Data General hardware, to resell its own software on behalf of Data General, and to repay Data
15 General if it failed to do so. The Amendment also included Data General's right to return all
16 unsold software that it purported to buy pursuant to the reseller agreement dated March 31, 1999.

17 80. McCALL, BERGONZI, LAPINE, and others concealed the Amendment so that it
18 would not be discovered by Deloitte. On or about April 20, 1999, BERGONZI and LAPINE
19 learned that Deloitte had sent a written audit confirmation request to Data General, asking it to
20 confirm that the $20 million Software Contract represented the entire agreement between Data
21 General and McKessonHBOC. Thereafter, BERGONZI contacted Data General representative in
22 an effort to delay Data General's response to the confirmation request until after
23 McKessonHBOC announced results for its fiscal quarter and year ended March 31, 1999.

24 81. On April 21, 1999, Data General's chief financial officer returned the confirmation
25 request to Deloitte, attaching the Amendment.

26 82. On or about April 22, 1999, McCALL contacted Data General's CEO and asked
27 whether Data Geneal would restructure the transaction by reducing or eliminating the right to
28 return unsold McKessonHBOC software. Data General's CEO refused McCALL's request.

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ                    19

**1**          83. On April 22, 1999, McKessonHBOC issued a press release announcing its

**2** preliminary financial results for the reporting period ended March 31, 1999. Deloitte advised

**3** McKessonHBOC that it should not include the Data General contract in its financial results

**4** because the revenue could not be recognized. The $20 million from Data General, however, was

**5** included in the company's financial results for the period as software revenue for the HBOC

**6** subsidiary, allowing McKessonHBOC to report earnings per share in excess of Wall Street

**7** forecasts. In the press release, McCALL stated that the HBOC subsidiary "generated 21 percent

**8** revenue growth in . . . information technology software . . . ." Approximately 16% of this

**9** reported revenue was from the fraudulent Data General transaction. McCALL repeated this

**10** information in a conference call with financial analysts on April 22, 1999.

**11** McKessonHBOC's Restatement of Financial Statements

**12**          84. On April 28, 1999, McKessonHBOC issued a press release announcing that it was

**13** investigating accounting irregularities in HBOC-related software sales and that the company

**14** would restate its financial results. On the day of this announcement, the share price of

**15** McKessonHBOC stock fell more than 40% from the prior day, from $65.75 to $34.50, on a

**16** volume of 41,625,900 shares. As a result, the value of stock held by McKessonHBOC

**17** shareholders fell by more than $9 billion. McKessonHBOC stock has not closed at a price above

**18** $41.81 since the day of the announcement.

**19**          85. McKessonHBOC issued its restated results on July 14, 1999. The restatement

**20** included the following adjustments to quarterly revenue and net income for the HBOC portion of

**21** the business during the period January 1, 1998 through March 31, 1999:

| Quarter Ending | REVENUE | | | NET INCOME | | |
|---|---|---|---|---|---|---|
| | Originally Reported | As Restated | % Overstated | Originally Reported | As Restated | % Overstated |
| 3/98 | $393.1 | $376.8 | 4.3 % | $64.9 | $45.6 | 42.3 % |
| 6/98 | $376.7 | $308.1 | 22.3 % | $75.6 | $23.5 | 221.7 % |
| 9/98 | $399.6 | $330.5 | 20.9 % | $83.7 | $16.5 | 407.3 % |
| 12/98 | $469.0 | $381.0 | 23.9 % | $59.6 | $8.5 | 601.2 % |
| 3/99 | $431.9 | $402.6 | 7.3 % | | | |

1    COUNT ONE: 18 U.S.C. § 371 (Conspiracy to Commit Securities Fraud)

2        86. Paragraphs 1 through 85 are realleged as if fully set forth here.

3        87. From in or about and between December 1997 to on or about April 27, 1999, both

4    dates being approximate and inclusive, within the Northern District of California and elsewhere,

5    the defendants

6                        CHARLES W. McCALL,
                        ALBERT J. BERGONZI,
7                         JAY LAPINE,

8    and others, knowingly and willfully conspired to commit offenses against the United States,

9    namely, (a) fraud in connection with the offer and sale, and the purchase and sale, of HBOC and

10   McKessonHBOC securities, in violation of Title 15, United States Code, Sections 78j(b), 78ff,

11   77q(a), and 77x and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) false and

12   misleading statements and omissions of material fact in reports and documents required to be

13   filed under the Securities Exchange Act of 1934 and the rules and regulations thereunder, in

14   violation of Title 15, United States Code, Sections 78j(b) and 78ff; (c) false and misleading

15   statements of material fact in reports and documents required to be filed under the Securities Act

16   of 1933, in violation of Title 15, United States Code, Sections 77q(a) and 77x; (d) falsified

17   books, records, and accounts of HBOC and McKessonHBOC, in violation of Title 15, United

18   States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of Federal

19   Regulations, Section 240.13b2-1; and (e) circumvention of HBOC and McKessonHBOC's

20   internal accounting procedures and system of accounting controls, in violation of Title 15, United

21   States Code, Sections 78m(b)(2)(B) and 78ff, all in violation of Title 18, United States Code,

22   Section 371.

23                               OVERT ACTS

24        88. In furtherance of the conspiracy and to effect the objects thereof, in the Northern

25   District of California and elsewhere, the defendants committed and caused others to commit the

26   acts described in paragraphs 17 through 83 of this Second Superseding Indictment, which are

27   hereby realleged as if fully set forth here.

28

1    89. The defendants committed and caused others to commit the following additional

2    overt acts in furtherance of the conspiracy, in the Northern District of California and elsewhere:

3        •    In or about March 1998, McCALL, BERGONZI, LAPINE, and another HBOC

4             officer met and discussed devices for inflating HBOC's revenue and earnings;

5        •    On or about May 11, 1998, HBOC's chief financial officer signed a Form 10-Q

6             that was filed with the SEC;

7        •    On or about August 3, 1998, HBOC's chief financial officer signed a Form 10-Q

8             that was filed with the SEC;

9        •    On or about September 11, 1998, LAPINE faxed a side letter to UPMC extending

10            the right to cancel the June 30, 1998, software license agreement until September

11            25, 1998;

12       •    On or about October 26, 1998, HBOC issued a press release announcing that it

13            had entered into a contract with Staff Builders;

14       •    On or about October 28, 1998, HBOC's chief financial officer signed a Form 10-

15            Q that was filed with the SEC;

16       •    On or about January 4, 1999, an HBOC officer sent a fax to GECC suggesting a

17            misleading response to an Arthur Andersen audit confirmation request;

18       •    On or about April 2, 1999, McCALL telephoned the chief executive officer of

19            Data General to discuss the pending contract negotiations for a contract for

20            quarter ending March 31, 1999;

21       •    On or about April 3, 1999, LAPINE told Data General employees that HBOC

22            required the software reseller agreement to be backdated to March 31, 1999, and

23            the agreement for HBOC to purchase hardware to be dated in April 1999;

24       •    On or about April 5, 1999, LAPINE faxed a revised reseller agreement to Data

25            General;

26       •    On or about April 22, 1999, McCALL spoke with the CEO of Data General and

27            requested that Data General agree to rescind McKessonHBOC's repurchase

28            obligation;

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ                    22

1   •   On or about April 22, 1999, McKessonHBOC issued a press release describing

2       preliminary financial results for the fiscal year ended March 31, 1999;

3   •   On or about April 22, 1999, McCALL participated in a conference call with

4       securities analysts in which he described the company's financial results for the

5       fiscal year ended March 31, 1999.

6   All in violation of Title 18, United States Code, Section 371.

**1** COUNT TWO: 15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. §240.10b-5, 18 U.S.C. § 2 (Fraud in

**2** Connection with Purchase and Sale of Securities)

**3**     90. Paragraphs 1 through 85 are realleged as if fully set forth here.

**4**     91. From in or about and between December 1997 to on or about April 27, 1999, both

**5** dates being approximate and inclusive, within the Northern District of California and elsewhere,

**6** the defendants

**7**                     CHARLES W. McCALL,
                    ALBERT J. BERGONZI,

**8**                     JAY LAPINE,

**9** and others, knowingly and willfully, directly and indirectly, by the use of the means and

**10** instrumentalities of interstate commerce, the mails, and the facilities of national securities

**11** exchanges, used and employed manipulative and deceptive devices and contrivances in

**12** connection with the purchase and sale of securities issued by HBOC and McKessonHBOC, in

**13** violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices,

**14** schemes, and artifices to defraud; (b) making and causing HBOC and McKessonHBOC to make

**15** untrue statements of material fact and omitting to state facts necessary in order to make the

**16** statements made, in light of the circumstances under which they were made, not misleading; and

**17** (c) engaging in acts, practices, and courses of business which operated and would operate as a

**18** fraud and deceit upon purchasers of HBOC and McKessonHBOC securities.

**19**     All in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 18,

**20** United States Code, Section 2.

**21**

**22**

**23**

**24**

**25**

**26**

**27**

**28**

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ           24

1 | COUNT THREE: 15 U.S.C. §§ 78j(b) and 78ff (False SEC Filing for Quarter Ended March 31,
2 | 1998)

3 | 92. Paragraphs 1 through 27 and 84 through 85 are realleged as if fully set forth here.

4 | 93. On or about May 11, 1998, within the Northern District of California and elsewhere,
5 | the defendant

6 | ALBERT J. BERGONZI

7 | in a Form 10-Q filed with the SEC for the period ended March 31, 1998, did knowingly and
8 | willfully make and cause HBOC to (a) make untrue statements of material fact and (b) omit to
9 | state material facts necessary to make the statements made not misleading.

10 | 94. Specifically, the Form 10-Q:

11 | a. Falsely reported software sales revenue that was generated through the
12 | deliberate use of improper accounting practices;

13 | b. Omitted to disclose that side letters to sales contracts and recourse agreements
14 | with GECC had been deliberately withheld from company books and records and from Arthur
15 | Andersen at the direction of top management, namely, McCALL, BERGONZI, LAPINE, and
16 | others;

17 | c. Falsely reported operating expenses that had been reduced, and net income that
18 | had been inflated, as the result of fraudulent entries to company books and records; and

19 | d. Omitted to disclose that those fraudulent entries were made in the books and
20 | records of the company.

21 | All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code
22 | of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

23
24
25
26
27
28

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ                          25

1 COUNT FOUR: 15 U.S.C. §§ 78j(b) and 78ff (False SEC Filing for Quarter Ended June 30,
2 1998)

3    95. Paragraphs 1 through 19, 28 through 41, and 84 through 85 are realleged as if fully
4 set forth here.

5    96. On or about August 3, 1998, within the Northern District of California and
6 elsewhere, the defendants

7                             CHARLES W. McCALL,
                             ALBERT J. BERGONZI, and
8                               JAY LAPINE,

9
   in a Form 10-Q filed with the SEC for the period ended June 30, 1998, did knowingly and
10
   willfully make and cause HBOC to (a) make untrue statements of material fact and (b) omit to
11
   state material facts necessary to make the statements made not misleading.
12
       97. Specifically, the Form 10-Q:
13
           a. Falsely reported software sales revenue that was generated through the
14
   deliberate use of improper accounting practices;
15
           b. Omitted to disclose that side letters to sales contracts and recourse agreements
16
   with GECC had been deliberately withheld from company books and records and from Arthur
17
   Andersen at the direction of top management, namely, McCALL, BERGONZI, LAPINE, and
18
   others;
19
           c. Falsely reported operating expenses that had been reduced, and net income that
20
   had been inflated, as the result of fraudulent entries to company books and records; and
21
           d. Omitted to disclose that those fraudulent entries were made in the books and
22
   records of the company.
23
       All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code
24
   of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.
25

26

27

28

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ                              26

1  COUNT FIVE:  15 U.S.C. §§ 78j(b) and 78ff (False SEC Filing for Quarter Ended September

2  30, 1998)

3      98.  Paragraphs 1 through 19, 42 through 56, and 84 through 85 are realleged as if fully

4  set forth here.

5      99.  On or about October 28, 1998, within the Northern District of California and

6  elsewhere, the defendants

7                    CHARLES W. McCALL,
                     ALBERT J. BERGONZI, and
8                       JAY LAPINE,

9  in a Form 10-Q filed with the SEC for the period ended September 30, 1998, did knowingly and

10  willfully make and cause HBOC to (a) make untrue statements of material fact and (b) omit to

11  state material facts necessary to make the statements made not misleading.

12      100.  Specifically, the Form 10-Q:

13          a.  Falsely reported software sales revenue that was generated through the

14  deliberate use of improper accounting practices;

15          b.  Omitted to disclose that side letters to sales contracts and recourse agreements

16  with GECC had been deliberately withheld from company books and records and from Arthur

17  Andersen at the direction of top management, namely, McCALL, BERGONZI, LAPINE, and

18  others;

19          c.  Falsely reported operating expenses that had been reduced, and net income that

20  had been inflated, as the result of fraudulent entries to company books and records; and

21          d.  Omitted to disclose that those fraudulent entries were made in the books and

22  records of the company.

23      All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code

24  of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

25

26

27

28

SECOND SUPERSEDING INDICTMENT                27
Case No. CR-00-0505-MJJ

1    COUNT SIX: 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78ff; 17 C.F.R. § 240.13b2-1; and 18

2    U.S.C. § 2 (Falsifying Books, Records, and Accounts)

3         101. Paragraphs 1 through 85 are realleged as if fully set forth here.

4         102. From in or about and between December 1997 to on or about April 27, 1999, both

5    dates being approximate and inclusive, within the Northern District of California and elsewhere,

6    the defendants

7
8
CHARLES W. McCALL,
ALBERT J. BERGONZI, and
JAY LAPINE,

9    knowingly and willfully, directly and indirectly, falsified and caused to be falsified books,

10    records, and accounts of HBOC and McKessonHBOC.

11        All in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and

12    78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1, and 18 U.S.C. § 2.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ
     28

**1** COUNT SEVEN: 15 U.S.C. §§ 78m(b)(2)(B), 78m(b)(5) and 78ff; 18 U.S.C. § 2

**2** (Circumventing Internal Accounting Controls)

**3**     103. Paragraphs 1 through 86 are realleged as if fully set forth here.

**4**     104. From in or about and between December 1997 to on or about April 27, 1999, both

**5** dates being approximate and inclusive, within the Northern District of California and elsewhere,

**6** the defendants

**7**
**8**

CHARLES W. McCALL,<br>
ALBERT J. BERGONZI, and<br>
JAY LAPINE,

**9** knowingly and willfully circumvented and caused others to circumvent the system of accounting

**10** controls required to be devised and maintained to provide assurances that transactions of HBOC

**11** and McKessonHBOC were recorded as necessary to permit preparation of financial statements in

**12** conformity with GAAP.

**13**     All in violation of Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5) and

**14** 78ff, and 18 U.S.C. § 2

**15**
**16**
**17**
**18**
**19**
**20**
**21**
**22**
**23**
**24**
**25**
**26**
**27**
**28**

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ       29

1 | COUNT EIGHT: 15 U.S.C. §§ 77q(a) and 77x; 18 U.S.C. § 2 (False Registration Statement)

2 | 105. Paragraphs 1 through 63 and 84 though 85 are realleged as if fully set forth here.

3 | 106. On or about November 13, 1998, within the Northern District of California and

4 | elsewhere, the defendants

5
6 | CHARLES W. McCALL,
ALBERT J. BERGONZI, and
JAY LAPINE,

7 | unlawfully, willfully, and knowingly, in a registration statement filed by McKesson and HBOC

8 | under the Securities Act of 1933 with respect to stock to be issued in conjunction with a merger,

9 | did make and cause to be made untrue statements of material fact, and omit to state and cause to

10 | be omitted material facts required to be stated therein and necessary to make the statements made

11 | not misleading, including:

12 | • The merger agreement incorporated by reference into the registration statement

13 | included a section titled "Representations and Warranties of HBO." That section

14 | contained the materially false representation that HBOC's financial statements

15 | filed with the SEC since 1996 "comply as to form, as of their respective dates of

16 | filing with the SEC, in all material respects with applicable accounting

17 | requirements and the published rules and regulations of the SEC with respect

18 | thereto, [and] have been prepared in accordance with GAAP . . . ."

19 | • Each of the Forms 10-Q incorporated into the registration statement contained

20 | materially false statements regarding HBOC's revenue and earnings for the first

21 | three quarters of 1998.

22 | • The *pro forma* condensed consolidated financial statements of income for HBOC

23 | for six month periods ending September 30, 1998, and twelve month periods

24 | ending March 31, 1998, included both revenue and income recorded in violation

25 | of GAAP.

26 | All in violation of Title 15, United States Code, Sections 77q(a) and 77x; and Title 18,

27 | United States Code, Section 2.

28

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ
30

1  COUNTS NINE through ELEVEN: 18 U.S.C. §§ 1341, 1343, 1346, and 2 (Mail and Wire Fraud;

2  Aiding, Abetting, and Willfully Causing)

3      107. The allegations of paragraphs 1 through 85 are realleged as if fully set forth here.

4      108. On or about the following dates, within the Northern District of California and

5  elsewhere, for the purpose of executing the foregoing scheme to defraud, the defendant

6                          ALBERT J. BERGONZI

7  did (i) place and cause to be placed in an authorized depositary mail for delivery by (a) the

8  United States Postal Service and (b) private or commercial interstate carrier; and (ii) did transmit

9  and cause the following to be transmitted by wire communication in interstate and foreign

10 commerce:

| Count | Date | Point of Origin | Point of Receipt | Communication |
|-------|------|-----------------|------------------|---------------|
| 9 | 3/30/99 | Atlanta, GA | Oracle Corp. Redwood Shores, CA | telephone conference call |
| 10 | 3/30/99 | Atlanta, GA | Oracle Corp. Redwood Shores, CA | facsimile |
| 11 | 3/31/99 | Atlanta, GA | Oracle Corp. Redwood Shores, CA | software sent via Interstate carrier |

All in violation of Title 18, United States Code, Sections 1341, 1343, 1346 and 2.

DATED:                                    A TRUE BILL.

6-3-03

$\underline{\quad hel\,son\,S.\,Hiraga \quad}$
FOREPERSON

KEVIN V. RYAN
United States Attorney

$\underline{\quad Mules\;B\;BR \quad}$
CHARLES B. BURCH
Chief, Criminal Division

(Approved as to form: _____ )
                     AUSA John H. Hemann
                     AUSA William H. Kimball

SECOND SUPERSEDING INDICTMENT
Case No. CR-00-0505-MJJ                    31